UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| WILLIE IVORY WHITE, | CASE NO. 1:14CV255 |
| Plaintiff, | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | |
| CAROLYN W. COLVIN[1], ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

Willie Ivory White ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), terminating her Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the ALJ's decision is AFFIRMED, and this case is DISMISSED with prejudice:

**I.    PROCEDURAL AND FACTUAL HISTORY**

On October 16, 2009, Plaintiff's SSI benefits, which she had collected for approximately fifteen years, were terminated due to a lack of evidence of Plaintiff's ongoing disability. ECF Dkt. #12 ("Tr.") at 113.[2] Plaintiff had previously been found to be disabled in 1994 because she suffered from mild mental retardation and another severe impairment, thereby meeting the Listing at 12.05C. Upon receiving the notice of termination of benefits, Plaintiff filed a request for reconsideration and continuation of benefits, which was granted. However, after further review, the Disability Hearing Officer found she was no longer disabled.

Plaintiff requested an administrative hearing, which was held on February 25, 2013. Tr. at 63-87. At the hearing, the ALJ accepted the testimony of Plaintiff, who was represented by counsel,

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

and Ted Macy, a vocational expert. On March 21, 2013, the ALJ issued a Decision terminating Plaintiff's SSI benefits. Tr. at 126-145. However, on July 22, 2013, the Appeals Council remanded the matter to the ALJ to consider the representative's objection to the admission of the report of consultative examiner, Deborah Koricke, Ph.D., at Exhibit 13F. Tr. at 146. The representative alleged that Dr. Koricke's opinion was unduly influenced by the report of consultative examiner, Mitchell Wax, Ph.D. Essentially, the representative argued that neither Dr. Wax nor Dr. Koricke had the medical record from the previous successful claim, and, as a result, Dr. Koricke relied exclusively upon Dr. Wax's conclusion that Plaintiff was malingering in order to explain her low IQ scores. The Appeals Council forwarded the documents from the prior successful claim to the ALJ, in order that the ALJ could also consider the representative's request to review those documents and include them in the current record.

At the second administrative hearing, held on October 29, 2013, a new ALJ accepted the testimony of Plaintiff, who was represented by counsel, Plaintiff's sister, Darnisha White ("Ms. White"), and Deborah Lee, a vocational expert ("V.E."). Tr. at 32-61. On December 3, 2013, the ALJ issued a Decision terminating Plaintiff's SSI benefits. Tr. at 11-29. Plaintiff filed a request for review, which the Appeals Council denied on January 2, 2014. Tr. at 1-5.

On February 6, 2014, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On May 22, 2014, Plaintiff filed a brief on the merits. ECF Dkt. #14. On July 23, 2014, with leave of the Court, Defendant filed a brief on the merits. ECF Dkt. #16. A reply brief was filed on August 5, 2014. ECF Dkt. #17.

## II. SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff, who was forty-four years of age on the date that her SSI benefits were terminated and forty-eight years of age at the second hearing, suffered from learning disability, affective disorder, asthma, mild lumbar degenerative disc disease, obesity, and an affective disorder, which qualified as severe impairments under 20 C.F.R. § 416.920(c). Tr. at 13. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§416.925, 416.926 ("Listings"). Tr. at 13.

On July 27, 1994, the date of the previous determination of disability, referred to as the comparison point decision ("CPD"), Plaintiff suffered from intellectual disability[3] and depression. Tr. at 13. These impairments were found to meet Listing 12.05C. Listing 12.05 reads, in its entirety:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>> 1. Marked restriction of activities of daily living; or
>>
>> 2. Marked difficulties in maintaining social functioning; or
>>
>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>
>> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P., App. 1, § 12.05.

To demonstrate intellectual disability, a claimant must demonstrate three factors to satisfy the diagnostic description: (1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations, in addition to qualifying under one of the four sets of criteria under Section 12.05. *Hayes v. Comm'r of Soc. Sec.*, 357 Fed.Appx. 672, 675 (6th Cir.2009). Even if a claimant's impairments are severe, each of these criteria must be proved in order for the claimant

---

[3]On August 1, 2013, the Social Security Administration amended subpart P of part 404. The term "mental retardation" was replaced with "intellectual disability." No other amendment was made to Listing 12.05.

-3-

to qualify for disability benefits. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

The ALJ ultimately concluded that, beginning on October 1, 2009, Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b), with the following limitations: She can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants. She is limited to simple, repetitive tasks. Tr. at 18. Although the ALJ concluded that Plaintiff was not capable of performing her past relevant work as a babysitter or child monitor, she could perform the unskilled, light representative occupations of cleaner housekeeper, folder (laundry); and cafeteria attendant. Tr. at 23. As a consequence, the ALJ found that Plaintiff's disability ended on October 1, 2009, and she had not become disabled again since that date. Tr. at 23.

### III.   STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the following required sequential steps for evaluating whether entitlement to DIB or SSI continues or should terminate:

(1) Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).

(2) If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).

(5) If we found at step (3) it is found that there has been no medical improvement or if it is found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an

-4-

exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

(6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

(7) If your impairment(s) is severe, the ALJ will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, the ALJ will assess your residual functional capacity based on all your current impairments and consider whether you can still do work your have done in the past. If you can do such work, disability will be found to have ended.

(8) If you are not able to do work that you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (f)(7) of this section and your age, education and past work experience (see paragraph (f)(9) of this section for an exception to this rule). If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

(9) We may proceed to the final step, described in paragraph (f)(8) of this section, if the evidence in your file about your past relevant work is not sufficient for us to make a finding under paragraph (f)(7) of this section about whether you can perform your past relevant work. If we find that you can adjust to other work based solely on your age, education, and residual functional capacity, we will find that you are no longer disabled, and we will not make a finding about whether you can do your past relevant work under paragraph (f)(7) of this section. If we find that you may be unable to adjust to other work or if § 404.1562 may apply, we will assess your claim under paragraph (f)(7) of this section and make a finding about whether you can perform your past relevant work.

20 C.F.R. §§ 404.1594(f)(1-9); 416.994(b)(5)(i-vii).

When the cessation of benefits is at issue, as here, the central question is whether the claimant's medical impairments have improved to the point where she is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1). Improvement is measured from "the most recent favorable decision" that the claimant was disabled. 20 C.F.R. § 416.994(b)(1)(i). There is no presumption of continuing disability. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286–287 n. 1 (6th Cir.1994). Instead, the Commissioner applies the procedures that are outlined in 20 C.F.R. §§ 404.1594 and 416.994 to determine whether a claimant's disability has ended and that she is now able to work.

-5-

The first part of the evaluation process, then, focuses on medical improvement. The implementing regulations define a medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Id.* And a medical improvement is related to an individual's ability to work only "if there has been a decrease in the severity . . .of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities ..." 20 C.F.R. § 404.1594(b)(3). See also *Nierzwick v. Commissioner of Social Security*, 7 Fed.Appx. 358 (6th Cir.2001).

The second part of the evaluation process relates to ability to engage in substantial gainful activity.  Here the implementing regulations incorporate many of the standards set forth in regulations governing initial disability determinations. See 20 C.F.R. § 404.1594(b)(5) and (f)(7). The difference, of course, is that the ultimate burden of proof lies with the Commissioner in termination proceedings. *Id.*; *Kennedy v. Astrue*, 247 Fed.Appx. 761, 764-765 (6th Cir.2007).

Of course, an ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

> 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§ 20 C.F.R. 404.1520(b) and 416.920(b) (1992));
>
> 2. An individual who does not have a "severe impairment" will not be found to be "disabled" (§§ 20 C.F.R. 404.1520(c) and 416.920(c) (1992));
>
> 3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§ 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§ 20 C.F.R. 404.1520(d) and 416.920(d) (1992));
>
> 4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§ 20 C.F.R. 404.1520(e) and 416.920(e) (1992));
>
> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§ 20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir.1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and RFC. See *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir.1990).

## IV.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V.     ANALYSIS

Plaintiff advances three arguments in this appeal. First, Plaintiff contends that the ALJ's conclusion that Plaintiff's intellectual disability has improved is not supported by substantial evidence. Next, Plaintiff asserts that the ALJ's conclusion that Plaintiff's intellectual disability no longer meets the Listing at 12.05C is not supported by substantial evidence. Finally, Plaintiff argues

-7-

that the ALJ erred when she did not credit the testimony of Plaintiff's daughter regarding Plaintiff's adaptive functioning.

### A. Medical evidence

In April of 1993, Plaintiff underwent a consultative psychological examination conducted by Richard Davis, Ph.D., at the state agency's request. Tr. at 657. Dr. Davis administered the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"), the results of which indicated a verbal IQ score of 70, a performance IQ score of 71, and a full scale IQ score of 69. Tr. at 659. Dr. Davis opined that these scores indicated mild mental retardation. Tr. at 659, 661. Dr. Davis opined that Plaintiff was functioning in the "mentally defective" range given her daily activities, which he characterized as somewhat restricted because of her limited intellectual abilities. Tr. at 660. Plaintiff did not consider herself to be employable because "I can't work and be on welfare" Tr. at 658. Dr. Davis opined that she appeared to be limited in her ability to think logically, use common sense, and apply judgment as indicated on her responses to the comprehension questions, Plaintiff also performed poorly on the vocabulary subtest. Tr. at 660.

In June of 1993, state reviewing psychologist Bruce Goldsmith reviewed the medical evidence and opined that Plaintiff met the threshold criteria for Listing 12.05C, in that she demonstrated significantly subaverage general intellectual functioning, with deficits in adaptive functioning, as evidenced by a valid verbal, performance, or full scale IQ score of 60-70. Tr. at 666. However, Dr. Goldsmith, in assessing the "B" criteria, found that Plaintiff had no more than slight limitations in any area of functioning. Tr. at 669. He concluded that she could perform simple, supervised tasks, but would have difficulties with concentration, persistence, or pace, and in relating to the public. Tr. at 673. State reviewing psychologist Donna Winter also reviewed the medical evidence, and she opined that Plaintiff met Listing 12.05C. Tr. at 689. She noted a full scale IQ of 69 and another physical or mental impairment posing significant work-related limitation. Tr. at 690, 693.

A little more than sixteen years later, on July 20, 2009, Plaintiff was examined by consultative psychological examiner, Mitchell Wax, Ph.D. Plaintiff, then forty-four years of age, reported that she quit school at seventeen years of age after getting pregnant, and had been taking

-8-

special education classes. Tr. at 522. She had a history of working as a cashier and fast food worker before quitting due to babysitting difficulties; she claimed she had not worked in fifteen years because she was taking care of her six children. Tr. at 522. She reported cooking, taking care of the house work, bathing, and caring for her children. Tr. at 524. Dr. Wax noted that she could manage the finances. Tr. at 524.

Plaintiff reported no history of psychiatric hospitalizations and no other kinds of hospitalizations within the past three years. Tr. at 523. She had a driver's license but had allowed it to expire. Tr. at 523. She took public transportation to the examination. Tr. at 521. Dr. Wax noted that she prepared detailed meals daily, did laundry twice weekly, and cleaned the bathroom three times per week. Tr. at 524. She was neat and clean in appearance. Tr. at 522.

Dr. Wax administered the Wechsler Adult Intelligence Scale, 4th edition (WAIS-IV), and noted that, although the scores indicated Plaintiff was in the mentally retarded range of intelligence, he suspected she was malingering. Tr. at 523. Plaintiff's IQ scores were: verbal comprehension 63; perceptual reasoning index 69; working memory index 71; and processing speed index 68, with a full scale IQ of 62. Tr. at 529. He opined that Plaintiff intentionally answered questions incorrectly. Tr. at 526. Dr. Wax further opined that her presentation during the clinical examination was not consistent with the WAIS-IV results and was more indicative of low average intelligence level, because her daily functioning and social skills showed higher cognition. Tr. at 524, 526. Dr. Wax also noted that Plaintiff held conversation easily and could understand sophisticated concepts and instructions at a level higher than someone who was mentally retarded. Tr. at 525. Dr. Wax concluded that the WAIS-IV results were invalid, as Plaintiff was autonomous in caring for both her home and herself. Tr. at 524. He concluded that she was capable of performing simple, repetitive tasks. Tr. at 527.

On August 4, 2009, Karla Voyten, Ph.D., reviewed the file on behalf of the Division of Disability Determination. Tr. at 530. Dr. Voyten observed that Plaintiff no longer suffered from an affective disorder and that her functioning was improved. Dr .Voyten also recognized that the IQ scores found by Dr. Wax were consistent with the IQ scores from 1993, but, nonetheless, acknowledged that Plaintiff no longer met the Listing at 12.05C.

Michael A. Harris, M.D., conducted a physical examination on September 8, 2009 during which he found limitation of motion in her cervical and lumbar spines and on x-ray she had findings of mild degenerative changes. He diagnosed her with chronic spondylogenic back pain and opined that she is limited to light exertional work activities with no repetitive bending or stooping. Tr. at 538. On September 14, 2009, W. Jerry McCloud, M.D. reviewed the record and concluded that Plaintiff would be limited to light work with occasional bending, crouching, crawling, balancing and stooping due to her back pain and spurring at multiple levels of her spine. Tr. at 541-548.

On September 16, 2009, Alice Chambly, Psy.D, reviewed the record and concluded that there was insufficient evidence to fully assess claimant's mental impairment. Tr. at 549. On September 29, 2009, Mel Zwissler, Ph.D., completed a Psychiatric Review Technique form and indicated that there was insufficient evidence to determine the severity of Plaintiff's mental functioning. He noted that Plaintiff had been found disabled as a child due to mental retardation and affective disorder, but that Dr. Wax's report suggested higher functioning. Tr. at 550-562. On February 2, 2010, Vicki Warren, Ph.D., completed a Psychiatric Review Technique form and found there was insufficient evidence to establish continuing disability. Tr. at 588-602.

On January 10, 2010, White completed a Function Report form with the help of her family. Tr. at 438-444. She reported that she could care for herself and cook meals, but she had help from her daughters to manage her finances. Plaintiff reported that she did not go out of her home alone, and she did not trust people.

Plaintiff receives her primary car from Neighborhood Family Health Center. On January 19, 2010, she was seen for depression/ bereavement due to the death of her mother, hypertension and noncompliance with medications. The physician noted that she seemed to misunderstand how to take her medication. Plaintiff stated that she thought she did not need continuing medication because the blood pressure was normal at last appointment. She also told the doctor that she was losing her disability benefits. Tr. at 581-582. On April 5, 2011, Plaintiff was seen for an asthma flare due to her house being cold because she did not pay her gas bill. Tr. at 652. She was prescribed Prednisone and Amoxicillin for her asthma, Celexa for depression and additional medication for hypertension. Tr. at 653. On August 8, 2011, Plaintiff reported a headache and chest pain. She admitted that she

was not taking her blood pressure medication regularly. Tr. at 645-648. She was again seen on October 9, 2011 and se reported that she was not taking her statin medications. Tr. at 643. On October 12, 2011, she was seen and reported that she was out of her medications because she lost her Medicaid. It was reinstated at that time and she was given new prescriptions for her medications. On February 7, 2013, Plaintiff was seen for back pain which was diagnosed as radiculopathy. Tr. at 625-626.

At a consultative examination with Deborah Koricke, Ph.D., on December 12, 2012, Plaintiff reported her work history, and also indicated that she quit her job due to problems with childcare. Tr. at 615. She reported that she lived with her 19-year-old daughter who did all of the cooking, but Plaintiff still cleaned and did laundry weekly. Tr. at 615. Plaintiff went to the grocery store once a week with her daughter. Tr. at 615. She reported that she dressed daily and showered every other day. Tr. at 615. Dr. Koricke opined that Plaintiff's overall cognitive functioning appeared to be more in the borderline range than mentally retarded range, especially given Plaintiff's competence level in managing her own affairs. Tr. at 616-617. On the WAIS-IV, Plaintiff attained a full scale IQ of 59, with a 61 in verbal comprehension and 64 in processing speed. Tr. at 618. Dr. Koricke questioned the validity of these scores, noting the questionably low scores that Dr. Wax reported, and she opined that Plaintiff could function at a much higher level than they indicated, as exemplified by her life organization skills and ability to handle her benefits. Tr. 617-18. Dr. Koricke also suspected malingering, and opined that Plaintiff appeared to be in the low average range of intellectual functioning. Tr. at 618.

Plaintiff underwent a consultative physical examination by Edward Butler, M.D., on December 12, 2012, in which the physician found normal range of motion, strength, reflexes, sensation and gait. Tr. at 603-606. She was able to ambulate without an assistive device. Tr. 604-605. Dr. Butler concluded that she should avoid respiratory irritants and would have mild limitations in pushing, pulling, and lifting. Tr. at 606.

### B. Hearing testimony and affidavits

At the hearing, Plaintiff testified that she takes prescription medication to treat hypertension, asthma, depression, and back spasms. Tr. at 43. She further testified that she had lost roughly forty

pounds since her disability was terminated. Tr. at 45. She reported that she was homeless for a period of time, but was living with her daughter at the time of the hearing. Plaintiff testified that she was applying for low cost housing, but that she has incorrectly completed the necessary paperwork. Tr. at 42.

Plaintiff explained that she babysat two children in the morning and two children in the afternoon at her home for a period of time when she had young children of her own. She was assisted by her older children. However, Plaintiff further testified that she would be unable to babysit children now because of her chronic back problems. She can only sit for forty-five minutes, and then must recline is order to alleviate her back pain. Plaintiff is incapable of the bending and stooping required to babysit children. Furthermore, her prescription muscle relaxers "knock [her] out." Tr. at 47.

Ms. White, Plaintiff's daughter testified that Plaintiff needs assistance with cooking and paying bills. Tr. at 49. Ms. White also helps Plaintiff with paperwork and money management. Tr. at 50. Ms. White testified that Plaintiff has always needed help functioning, and that, in the past, Plaintiff's sister visited Plaintiff a couple times a month and assisted her with housekeeping and bill payment. Tr. at 50-51. According to Ms. White, Plaintiff's back is a constant source of pain, and Plaintiff must alternate between sitting and reclining when watching television. Ms. White often rubs her mother's back to alleviate her ongoing pain, which is also treated with ibuprofen. Tr. at 53.

In addition to Ms. White's testimony at the hearing, Plaintiff's sister Laura White ("Laura") submitted an affidavit dated March 7, 2013. Laura reported that Plaintiff's mother had supervised her for all of her life until her mother passed away. Thereafter, Laura had taken on the responsibility of checking on Plaintiff, taking her to shop and paying her bills, and offering help where needed. She was of the opinion that her sister would not be able to function successfully if she did not have appropriate supervision. Tr. at 475.

### C.     The ALJ's Decision

The ALJ relied upon Plaintiff's significant adaptive functioning, that is, her past unskilled (fast food service jobs during her teenage years) and semi-skilled work (babysitting), living on her own and raising six children with minimal assistance, and managing household responsibilities, to

-12-

conclude that Plaintiff had no more than mild limitations in this functional domain. Tr. at 15. Although the ALJ recognized that Plaintiff had moderate intellectual difficulties, she found that Plaintiff did not demonstrate any significant attention or concentration issues, and that she engaged in a wide range of daily activities. Tr. at 16.

With respect to Listing 12.05C, the ALJ concluded that there is no evidence in the record to establish that Plaintiff's deficits in adaptive functioning manifested before the age of twenty-two. Tr. at 16. The ALJ wrote:

> The prior favorable decision was based on IQ testing performed at age 27, and [Plaintiff's] subjective reports of significant dependence on others for her activities of daily living, which is completely contradicted by her later reports discussed above. Therefore, the undersigned concludes that the severity of [Plaintiff's] mental impairments do not meet the first requirements of listing 12.05, as the evidence does not establish adaptive deficits prior to age 22.

Tr. at 16. Furthermore, the ALJ gave little weight to Plaintiff's IQ scores (which were in the range of 12.05C), writing:

> [B]oth Dr. Wax and Dr. Koricke opined that these scores were not a valid representation of [Plaintiff's] adaptive functioning or cognitive abilities, as she had a wide range of daily activities, including primary parenting responsibilities for raising six children. Dr. Wax noted that she appeared to be intentionally answering questions incorrectly. Dr. Koricke also noted this behavior on examination. Based on the findings on examination, Dr. Koricke opined that [Plaintiff] was most likely in the low average range of intelligence, based on her ability to organize her life and access benefits.

Tr. at 17.

Moreover, the ALJ rejected the representative's assertion that Dr. Koricke was unduly influenced by Dr. Wax's opinion insofar as "Dr. Koricke administered independent WAIS-IV testing, and had the opportunity to observe [Plaintiff's] presentation, reported history, demeanor, and performance during that evaluation, and base the ultimate conclusion on those new objective findings." Tr. at 17.

The ALJ ultimately concluded that Plaintiff's poor grades in school were not necessarily an indicator of intellectual disability, but could have been the result of a lack of motivation, and that her history of performing a wide range of simple functions inside her home demonstrated that her learning disabilities do not limit her ability to perform simple, routine tasks. Tr. at 20. The ALJ undertook a comparison of Plaintiff's current condition with her condition at the CPD. Considering

the 1993 consultative examination, the ALJ found that Plaintiff's depressive symptoms had improved, and that her current affect was reactive and her thought content was appropriate. Tr. at 20. Plaintiff demonstrated no difficulty with concentration or responding to questions. As a consequence, the ALJ found that Plaintiff's intellectual disability and depression had improved, and that she was capable of performing substantial gainful activity.

### D. Opinion evidence

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

Finally, evidence from "other sources" may not be used to establish the existence of a medically determinable impairment or given controlling weight, however, the ALJ may use evidence from "other sources" to demonstrate the severity of the claimant's impairments and how it affects the claimant's ability to function. 20 C.F.R. § 404.1513(d)(1); *Cruse v. Comm'r*, 502 F.3d 532, 541 (6th Cir.2007. "Other sources" include nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists. *Id.* When considering opinions from non-medical

sources who have seen a plaintiff in a professional capacity, the ALJ should look to several factors, including the opinion's consistency with other evidence, how long the source has known the individual, and how well the source explained his opinion. *Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 820 (N.D.Ohio 2009) (citing *Cruse, supra*, at 541.) Non-medical sources may also include spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers.

Plaintiff contends that the ALJ's conclusions that her intellectual disability has improved and that she is capable of full-time work are not supported by substantial evidence. Plaintiff first challenges the ALJ's conclusion that there is no evidence that her developmental delays began before age 22, and , therefore, she no longer meets Listing 12.05C. Plaintiff argues that the successful claim in 1994 established that element of the 12.05C requirements and that a second ALJ cannot alter a final determination of the Commissioner. It is well-settled that the doctrines of *res judicata* and collateral estoppel apply to finding made by the Commissioner. See *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir.1997). Accordingly, without the benefit of new evidence regarding Plainitff's developmental delays before age 22, the determination of the 1994 application cannot be reversed. Next, Plaintiff challenges the weight given by the ALJ to the opinions of consulting examiners, Dr. Wax and Dr. Koricke, regarding Plaintiff's adaptive function capabilities. Plaintiff contends that the IQ scores, which were discounted by the ALJ based upon the consulting examiners' conclusions that Plaintiff was malingering, were consistent with her earlier scores, and, therefore, should have been credited in both the12.05C analysis and the sequential analysis.

To the contrary, the ALJ credited the opinions of Drs. Wax and Koricke regarding the IQ scores, because their opinions were supported by other evidence in the record, that is, Plaintiff's ability to run a household with six children, and to care for other people's children in the makeshift day care center she created in her home. Moreover, the opinions of Drs. Wax and Koricke were consistent with the opinion of Dr. Voyten. Plaintiff contends that the ALJ ignored the fact that Plaintiff was not responsible for the paperwork associated with the babysitting business (the evidence throughout the record show that Plaintiff has difficulty with reading and completing

forms), however, the ALJ did recognize Plaintiff's reading limitation by circumscribing her RFC to simple and repetitive tasks.

Plaintiff also argues that the ALJ failed to give appropriate weight to the opinions of Plaintiff's daughter and sister regarding her adaptive functioning. Plaintiff contends that her family members provided the most detailed and insightful testimony about her daily activities and limitations. The ALJ found that the opinion testimony offered by Plaintiff's family members was biased, due to the fact that is was inconsistent with the evidence in the record.

Plaintiff argues that the ALJ's decision to discredit the non-medical opinion testimony was in error, particularly since the ALJ credited an unsigned "Report of Contact," see Tr. at 425, which purported to document a telephone conversation between Plaintiff and an unidentified DDD representative. The report, dated June 9, 2009, shortly after the death of Plaintiff's mother, indicates that Plaintiff wakes her children for school at 6:00 a.m. to prepare them for school, walks to a friend's house for a visit, and prepares an early dinner for her children each day. She grocery shops every two weeks, enjoys family functions, dancing, and going out to dinner. Plaintiff reported struggling since the death of her mother, but being capable of washing clothes, cooking and cleaning, and paying her bills through a money exchange.

Having reviewed the non-medical opinion testimony and the unsigned June 9, 2009 report, the Court finds that the ALJ did not err in discrediting the non-medical opinion evidence. The evidence regarding Plaintiff's adaptive functioning in the record is inconsistent, and it is within the ALJ's purview to weigh conflicting evidence. Moreover, her decision to credit the unsigned June 9, 2009 report is not an error insofar as the report is supported by other evidence in the record.

Finally, in an argument raised for the first time in her reply brief, Plaintiff argues that the ALJ did not consider the records of Plaintiff's treating physician. Plaintiff received her primary care from Neighborhood Family Health Center. Rather than relying on a medical opinion provided by a treating physician regarding Plaintiff's intellectual disability, Plaintiff instead relies on notations in the medical records regarding Plaintiff's failure to take her blood pressure medication because she did not understand that it must be taken consistently regardless of her daily blood pressure scores. Plaintiff also cites portions of the medical records from Neighborhood Family Health Center

that establish that Plaintiff suffered an asthma flare due to her gas being turned off for failure to pay her gas bill. The medical records also document that Plaintiff lost her Medicaid benefits. Plaintiff contends that the foregoing evidence establishes a deficit in adaptive functioning, and that the ALJ's failure to give controlling weight to these finding constitutes error. To the contrary, the treating physician's rule, which requires that controlling weight be given to the opinion of a treating physician to the extent that such an opinion is supported by the record, does not apply in this circumstance.

## VI. CONCLUSION

For the foregoing reasons, the ALJ's decision is AFFIRMED and this matter is DISMISSED with prejudice.

DATED: March 6, 2015

                                  */s/George J. Limbert*
                                  GEORGE J. LIMBERT
                                  UNITED STATES MAGISTRATE JUDGE